# SHER TREMONTE LLP

July 24, 2024

**BY ECF**

The Honorable Victor Marrero
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:  ***United States v. Eran Hiya,*** Case No. 24-CR-282 (VM)

Dear Judge Marrero:

We represent Eran Hiya.  We write on behalf of our client in response to the government's opposition to our motion (the "Motion" or "Mot.") for return of property pursuant to Rule 41(g) of the Federal Rules of Criminal Procedure.  See Dkt. # 22 ("Opp.").

## The Government Should Return Mr. Hiya's Unlawfully Seized Devices

In his Motion, Mr. Hiya seeks the return of four cellphones and one laptop computer (the "Devices") seized when Mr. Hiya was arrested by Malaysian police on April 4, 2024, and subsequently seized by U.S. law enforcement—without a warrant— when FBI agents removed Mr. Hiya from Malaysia on May 13, 2024.  The government does not dispute that Mr. Hiya was in lawful possession of the Devices when he was arrested,[1] nor does it assert that the Devices are contraband.  Therefore, the only contested issue is whether the seizure and continued retention of the Devices by the government was illegal. *See Ferreira v. United States*, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005) (to prevail on a Rule 41(g) motion for return of property, a movant must show "(1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended.").

The government makes three arguments defending the legality of its seizure and subsequent search of the Devices.  First, it argues that the conduct of the Malaysian

---

[1]      For the sake of clarity, Mr. Hiya's assertion that he had lawful possession of the Devices, along with a corresponding privacy interest, does not constitute an assertion that all of the contents of the communications on those Devices are his.

90 Broad Street | 23rd Floor | New York, NY 10004
www.shertremonte.com | tel. 212.202.2600 | fax. 212.202.4156

Hon. Victor Marrero
July 24, 2024
Page 2

officials who seized Mr. Hiya's Devices and turned them over to the FBI does not implicate constitutional protections. Opp. at 4-5. Second, it argues that there was probable cause to believe that each of the Devices contained evidence of a crime, and that the basis for probable cause is set out in the Affidavit of FBI Special Agent Jennifer Lewis. *See* Opp. at 6-7; Dkt. # 20-1 (the "Warrant"); Dkt. #20-2 (the "Lewis Affidavit"). Third, the government contends that it acted with sufficient promptness in obtaining a search warrant after the Devices' seizure. Opp. at 8-10. Each of these arguments is unavailing.

## I.    U.S. Law Enforcement Had No Basis to Seize the Devices

The government argues that the Fourth Amendment is not implicated by Malaysian law enforcement's seizure of the Devices, and their subsequent turnover to the FBI was reasonable. Opp. at 5-6. The government is wrong.

First, the motion does not only implicate the conduct of the Malaysian authorities. On May 13, 2024, six weeks after the Malaysian government initially detained Mr. Hiya, the United States took him into custody and took possession of the Devices. *See* Ex. A (FBI record reflecting its receipt of the Devices from Royal Malaysian Police). Its possession and continued retention of the Devices itself constitutes a seizure. The government asserts that this seizure was "reasonable" because otherwise this property (including the Devices) would have been abandoned in Malaysia. Opp. at 6. But that is not so. Malaysian authorities could have turned over Mr. Hiya's personal effects and the Devices to his Malaysian counsel, who had previously inquired about the property. Moreover, on May 20, 2024, when Mr. Hiya first appeared in court in the United States, other property items were returned to Mr. Hiya's counsel, but the Devices were not. *See* Ex. B (property receipt). When counsel made an oral motion for the return of *all* of his property, the government opposed the request on the technical grounds that the request was outside of the scope of the Magistrate Judge referral. *See* Ex. C at 27:22-28:10 (bail hearing transcript).[2] Thus, regardless of whether it was reasonable for U.S. authorities to take possession of the phones on May 13, the ongoing retention of the Devices by U.S. law enforcement was plainly not reasonable, and the government has offered no basis for keeping the Devices beyond that date.

Moreover, the conduct of the Malaysian government cannot escape constitutional scrutiny. As the government concedes, the Fourth Amendment is implicated when "the conduct of foreign law enforcement officials rendered them agents, or virtual agents, of United States law enforcement officials" or "the cooperation between the United States and foreign law enforcement agencies is designed to evade constitutional requirements applicable to American officials." *United States v. Getto*, 729 F.3d 221, 230 (2d Cir. 2013).

---

[2]    Due to a typographical error, this transcript is erroneously dated May 2, 2024; this proceeding took place on May 20, 2024. *See* Dkt. # 8.

Hon. Victor Marrero
July 24, 2024
Page 3

The government baldly asserts that there is no evidence showing that U.S. law enforcement cooperated with Malaysian authorities, and further suggests that allegations of cooperation would not make sense "since neither the FBI nor the U.S. Attorney's Office was aware that the defendant would be detained, and his property seized, in Malaysia until *after* the Malaysian authorities had done so." Opp at 5-6.

But this assertion is at odds with the government's discovery. According to documents produced after the filing of Mr. Hiya's Motion, it appears that U.S. law enforcement officials were in contact with Malaysian law enforcement *prior* to Mr. Hiya's arrest, seeking information about his activities in the country and receiving updates from the Royal Malaysian Police. *See, e.g.,* Ex. D (February 13, 2024 message from Royal Malaysian Police to the FBI, detailing its "findings" as to Mr. Hiya, in response to a January 10, 2024 inquiry from the FBI). Moreover, at the same time, U.S. law enforcement officials were closely coordinating with Israel, exchanging information about Mr. Hiya's whereabouts. *See* Ex. E (November 28, 2023 message from FBI Tel Aviv attaché relaying Israel National Police request for information on Mr. Hiya's activities in Malaysia); Ex. F (March 4, 2024 message from Israeli National Police to the FBI, providing information on Hiya's travel). These documents suggest close coordination between Malaysian and U.S. law enforcement in the period leading up to Mr. Hiya's April 4, 2024 arrest in Johor, and, moreover, that the United States may have instigated Mr. Hiya's arrest and detention in order to assist Israeli law enforcement. At a minimum, the evidence calls into doubt the government's assertion that it was unaware of Mr. Hiya's April 4 arrest until after it occurred.[3]

Further, regardless of whether, or the extent to which, the Malaysian government cooperated with U.S. law enforcement at the time of Mr. Hiya's initial April 4 arrest, Malaysian authorities "re-arrested" him on April 18, 2024. On that day, Mr. Hiya was permitted to see his Malaysian attorney and initially informed that he would be released from Dang Wangi Police Headquarters. But as Mr. Hiya and his attorney exited Dang Wangi, Mr. Hiya was approached by officers from another Malaysian police branch (the Ibu Pejabat Kontinjen Kuala Lumpur) who then rearrested him, allegedly based on suspicions of organized crime. At the time of his second arrest, Malaysian counsel

---

[3]   Even if it were true that U.S. authorities were not aware of Mr. Hiya's detention until after it occurred, this would not (standing alone) disprove that such authorities instigated Mr. Hiya's arrest and the unlawful seizure of his Devices in cooperation with Malaysian authorities. It is entirely logical to infer that U.S. law enforcement coordinated with Malaysian authorities and encouraged or directed Mr. Hiya's arrest, but did not learn that this instruction had been carried out by Malaysian authorities until after the fact. To the extent the Government's argument depends on factual assertions regarding the extent of its cooperation with Malaysian officials and when it became aware of Mr. Hiya's detention, such assertions should be established in an evidentiary hearing.

Hon. Victor Marrero
July 24, 2024
Page 4

inquired about the return of Mr. Hiya's property, but Malaysian authorities said the items would be returned later.

Given the timing, there is ample reason to infer that Malaysian authorities were cooperating with U.S. law enforcement at the time of this second arrest. Specifically, by the time of this second arrest (and the corresponding retention of the Devices), the U.S. government had filed a federal complaint charging passport fraud (Ex. G); obtained an arrest warrant for Mr. Hiya (Ex. H); and written to the Malaysian government seeking Mr. Hiya's "deportation" (Ex. I). The notion that the Malaysian authorities were acting independently at the time of this second "arrest" strains credulity.[4]

Given the discrepancies between the documents and the government's assertions in its Opposition, as well as the timing of Mr. Hiya's arrests, this Court should schedule an evidentiary hearing. In fact, Rule 41(g) provides that "[t]he court *must* receive evidence on any factual issue necessary to decide the motion." Fed R. Crim. P. 41(g) (emphasis added). Here there is a factual dispute as to whether (1) the U.S. government's May 13, 2024 seizure and subsequent retention of Mr. Hiya's property was reasonable; and (2) whether the Malaysian authorities acted as *de facto* agents of the U.S. government when it detained Mr. Hiya and seized his Devices, first on April 4, 2024, and then again on April 18, 2024. A hearing is warranted. *See United States v. Podlog*, 108 F.3d 1370, 1370 (2d Cir. 1997) (a district court must hold an evidentiary hearing under rule 41(g) "if any disputed material facts are necessary to the decision of the motion").

## II.    The Warrant Authorizing a Search of the Devices is Not Supported by Probable Cause and None Exists

Regardless of whether the initial seizure of the Devices was reasonable, the ongoing retention and search of the Devices can only be justified by a showing of probable cause. While the government asserts that probable cause to seize and search the Devices is set out in the March 28, 2024 warrant application, the Lewis Affidavit is

---

[4]    The government concedes that evidence illegally obtained abroad may also be excluded when the conduct of foreign law enforcement officials "shocks the judicial conscience." *United States v. Lee*, 723 F.3d 134, 140 (2d Cir. 2013) (cleaned up). This principle does not derive from the Fourth Amendment but from "from a federal court's authority to exercise its supervisory powers over the administration of federal justice." *Getto*, 729 F.3d at 229. There is no case holding that only physical abuse or torture can shock the conscience, and here it is relevant that Mr. Hiya was detained for an extended period without notice of charges against him and without a meaningful opportunity to contest his detention. While the government touts the fact that Mr. Hiya twice saw a judge, it ignores that he was blindfolded and unrepresented at those appearances, and that the proceedings were conducted entirely in Malay. *See* Opp. at 5 ("[Mr. Hiya] admits that he was . . . twice brought before a judge").

Hon. Victor Marrero
July 24, 2024
Page 5

devoid of any such showing, and the government offers the barest of rationales to support the warrant.

It is "familiar history" that the Fourth Amendment was designed to prohibit "indiscriminate searches and seizures conducted under the authority of 'general warrants,'" *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018). The Amendment's objective is to prevent "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). For this reason, it is not enough that the government establish probable cause to believe that a crime was committed; rather, a probable cause showing must demonstrate a "sufficient nexus between the criminal activities alleged" and the items searched. *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004). *See also Illinois v. Gates*, 462 U.S. 213, 238 (1983) (probable cause under the Fourth Amendment requires a showing that there is "a fair probability that contraband or evidence of a crime will be found *in a particular place*." (emphasis added)). There is no such nexus here, and to accept the government's faulty logic would effectively endorse the use of general warrants in any conspiracy case. That is not the law.

First, there is nothing in the warrant application linking the charged conspiracy to *any* digital or electronic evidence, let alone the specific Devices seized. While the Lewis Affidavit recites at length the grounds to believe that Mr. Hiya conspired with others to commit passport fraud, it does not reference any evidence of text communications, use of electronic devices, or relevant phone calls associated with the charged passport fraud scheme. The government argues that because Mr. Hiya is charged with conspiring with others to commit passport fraud, there is "more than a 'fair probability' that evidence of the defendant's communications with co-conspirators existed on the defendant's personal electronic devices." Opp. at 7-8. The government's position is contrary to the law, as such conclusory assumptions fall far short of establishing probable cause. *See United States v. Griffith*, 867 F.3d 1265, 1275 (D.C. Cir. 2017) (rejecting proposition that suspected involvement in a crime ordinarily justifies belief that the person's cell phone contains evidence of the crime); *United States v. Kortright*, No. 10-CR-937 (KMW), 2011 WL 4406352, at *7 (S.D.N.Y. Sept. 13, 2011) (detective's testimony that drug traffickers typically keep evidence in their homes insufficient to support search warrant to search home).

Because neither the Opposition nor the Lewis Affidavit identifies any use of electronic devices in connection with the charged conspiracy, the government's argument boils down to the proposition that whenever a criminal defendant is charged with conspiracy, there is probable cause to believe that evidence of that conspiracy is located on the defendant's personal electronic devices simply because alleged co-conspirators might talk about their scheme using the devices. The Fourth Amendment prohibits this type of exploratory fishing expedition based on mere speculation; if it did not, in the pre-digital age police could have justified searing private homes for letters between co-

Hon. Victor Marrero
July 24, 2024
Page 6

conspirators. *See Coolidge*, 403 U.S. at 467 (Fourth Amendment intended to prevent "general, exploratory rummaging in a person's belongings"). As the Supreme Court has recognized, when it comes to privacy concerns, cell phones are at least the equivalent of homes. "A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form." *Riley v. California*, 573 U.S. 373, 396-97 (2014).

Second, the only specific basis offered for probable cause is the government's assertion that that on one occasion (November 13, 2023) an email was sent from a Gmail account eranelyh@gmail.com containing allegedly false documents to U.S. State Department officials. Opp. at 7. But sending one email to the U.S. State Department does not in any way support the conclusion that co-conspirators also communicated by email or text. While the existence of this email might – at best – be relevant to an application for a warrant to search that particular Google account, the government fails to offer any reason why the four phones seized six months later might contain emails from that particular account, or in fact *any* relevant electronic communications. Indeed, at the time of the seizure, it did not even know the phone numbers associated with the phones, or for how long the Devices had been in use. In short, the government's contention that there was "more than a 'fair probability' that evidence of the defendant's communications with co-conspirators existed on the defendant's personal electronic devices," Opp. at 7-8, amounts to pure speculation – guesswork that the Fourth Amendment prohibits. *See United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (explaining that "probable cause to search a location for . . . particular items or records . . . does require more than a 'hunch'"). Indeed, in the initial returns provided by the government, it appears that none of the Devices are in fact linked with Gmail accounts, let alone the Gmail account associated with the single email cited in the warrant application.

Finally, the government's faulty logic highlights the warrant's overbreadth, in addition to its lack of particularity. *See United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013) (to satisfy particularity requirement, a warrant must "identify the specific offense for which the police have established probable cause;" "describe the place to be searched;" and specify "the items to be seized by their relation to designated crimes"); *Id.* at 446 (a warrant is overbroad where its "description of the object to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based."). Here, even if the one email provided probable cause to search for other emails, it certainly did not establish probable cause to search the entire contents of the phones and laptop, including internet searches, text messages, and photographs. As the Second Circuit has noted, the particularity requirement "demands a heightened sensitivity" in the context of electronic searches because of the plain view doctrine: "Once the government has obtained authorization to search the hard drive, the government may claim that the contents of every file it chose to open were in plain view and, therefore, admissible even if they implicate the defendant in a crime not contemplated by the warrant. There is, thus, 'a serious risk that every warrant for electronic information will become, in effect, a

Hon. Victor Marrero
July 24, 2024
Page 7

general warrant, rendering the Fourth Amendment irrelevant.'" *Galpin*, 720 F.3d at 447 (quoting *United States v. Comprehensive Drug Testing, Inc.,* 621 F.3d 1162, 1176 (9th Cir.2 010)). *See also Riley*, 573 U.S. at 403 (noting that cell phones are "not just another technological convenience" because "they hold for many Americans the privacies of life" (internal quotation marks omitted)). Here, there is no probable cause to search any of the Devices, let alone the entire contents of those Devices.

### III.    The Government's Delay in Obtaining the Warrant Was Unreasonable

Mr. Hiya's Motion should also be granted because the government's delay in obtaining a warrant for the Devices was unreasonable. In its Opposition, the government contends that the Court should excuse its delay in seeking a warrant for the Devices because "courts have found far longer delays reasonable under the circumstances." Opp. at 9. But whether a particular delay is "reasonable" depends on the particular circumstances of the case. *See United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998) (discussing how 11 days might constitute unreasonable delay, and observing that "we would normally expect police officers to secure a search warrant in *considerably less time* than" eleven days) (emphasis added); *United States v. Dass*, 849 F.2d 414, 415-16 (9th Cir. 1988) (finding unreasonable delays of between seven to 23 days to seek search warrants for seized packages).

Conspicuously absent from the government's submission is any persuasive explanation as to why the circumstances of this case made it reasonable to wait two weeks after obtaining the Devices to seek a warrant. Indeed, the government applied for the warrant more than a month after it was in contact with Malaysian officials about Mr. Hiya's arrest and more than a month after it had filed the complaint and obtained an arrest warrant. *See* Exs. G, H. The government's delay in seeking the warrant until May 28 is particularly inexplicable because Mr. Hiya made an oral motion for the return of the Devices on May 20, putting the government on notice that he sought return of the Devices. The government suggests that its delay may be excused because during the week after Mr. Hiya's arrival in the country, "the prosecution team focused on the [May 20th] contested bail hearing" in Mr. Hiya's extradition proceeding. Opp. at 10. But responding to an oral motion for bail in an extradition case, in which detention is almost a foregone conclusion, in no way excuses the government's delay. Indeed, even if the Court were to accept the argument that the U.S. Attorney's Office and the FBI can focus on only one task at a time, it does not explain why the government held the Devices for another eight days after Mr. Hiya moved for their return. *See United States v. Smith*, 967 F.3d 198, 210 (2d Cir. 2020) (government failed to justify delay where "record [did] not show that there was any particular investigation or police duty that specifically delayed [the officer] in applying for a search warrant").

Hon. Victor Marrero
July 24, 2024
Page 8

     For the foregoing reasons, the Court should grant Mr. Hiya's Rule 41(g) motion and order return of his electronic devices.  In the alternative, the Court should schedule an evidentiary hearing.

                Respectfully submitted,

                */s/Justine Harris*
                Justine Harris
                Noam Biale
                Wes Erdelack

                *Attorneys for Eran Hiya*

cc:    Assistant U.S. Attorney James Mandilk (by ECF)