

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 23, 2024

**BY ECF**
The Honorable Victor Marrero
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

      **Re:** *United States v. Eran Hiya,* **24 Cr. 282 (VM)**

Dear Judge Marrero:

      The Government respectfully files this response to defendant Eran Hiya's October 9, 2024, Objections (Dkt. 33) (the "Objections") to Magistrate Judge Netburn's September 24, 2024, Report and Recommendation (Dkt. 31) (the "Report and Recommendation"), in which Judge Netburn recommended denying in part the defendant's July 3, 2024, motion for pretrial return of five electronic devices (the "Devices") that were seized by Malaysian authorities (Dkt. 19 (the "Motion" or "Mot.")). Specifically, Judge Netburn held that the May 29, 2024, search warrant for the Devices was (1) supported by probable cause, as Judge Wang also independently determined when issuing the warrant; and (2) obtained without unreasonable delay. Judge Netburn reserved on whether the U.S.-Malaysian relationship in this case implicated constitutional restrictions on the Government's authority to search, and she also reserved on whether that issue may require an evidentiary hearing.

      A.  Factual Background

      This case arises from the defendant's participation in a conspiracy to secure American passports for his children, who are not U.S. citizens or nationals, by lying to U.S. immigration officials. The defendant's children were born outside the United States in 2022. Because the defendant is a U.S. citizen but his spouse is not a U.S. citizen or national, whether his children inherited U.S. citizenship at birth depended on the length of time the defendant had spent in the United States at the time his children were born. Specifically, his children would have inherited U.S. citizenship at birth if (a) the defendant "was physically present in the United States or its outlying possessions for a period or periods

totaling not less than five years" before his children's birth and (b) "at least two" of these five years "were after [the defendant] attain[ed] the age of fourteen years." 8 U.S.C. § 1401(g). The defendant came nowhere close to satisfying the latter requirement: after attaining age 14, he spent no more than 221 days in the United States—509 days short of the two-year requirement. Accordingly, his children did not inherit U.S. citizenship at birth.

The defendant knew about the residency requirements at the time he submitted paperwork in support of his passport applications because a consular official told him and his wife about the requirements, instructing them to submit proof establishing that he had been in the United States for five years, including two years after his fourteenth birthday. Instead of honestly reporting his U.S. residency, the defendant tried to trick immigration officials into thinking he met the requirements by lying about the dates he had been present in the United States. And, together with one or more co-conspirators, he acquired falsified documents and false affidavits to purportedly show his presence in the United States. These documents included falsified medical and educational records and a notarized statement by a purported roommate—someone who later acknowledged that he does not know the defendant.

B. Procedural History

On May 6, 2024, a grand jury in this District returned Indictment 24 Cr. 282 (VM) (the "Indictment"), charging the defendant with one count of conspiracy to unlawfully apply for and attempt to procure U.S. citizenship, in violation of Title 18, United States Code, Section 371, and with one substantive count of doing the same, in violation of Title 18, United States Code, Section 1425. The Court issued an arrest warrant.

At the time, the defendant was detained in Malaysia.[1] After learning that the defendant was in Malaysian custody, the FBI requested that Malaysia deport the defendant to the United States (his country of birth). The Malaysian government agreed to do so. On May 13, 2024 (local time in Kuala Lumpur), Malaysian authorities transferred custody of the defendant to the Federal Bureau of Investigation ("FBI"), who executed the arrest warrant issued by this Court pursuant to the Indictment. At the same time, the FBI also took custody of items that the Malaysian authorities had seized from Hiya incident to his arrest in Malaysia, including three passports in the defendant's name or a variation thereof (Turkish, Polish, and American), a Turkish identity document, the Devices, three other electronic devices, chargers, a Louis Vuitton bag, a Rolex watch, and Thai and Malaysian currency.

On May 14, 2024, FBI agents brought the defendant to the courthouse in this District for presentment and arraignment. The defendant did not request court-appointed

---

[1] The Government lacks detailed information about the Malaysian authorities' arrest and detention of the defendant, but, as background, the defendant is the leader of a major Israeli organized-crime family (the "Hiya Gang"). The Hiya Gang is at war with a rival gang (the "Musli Gang"). Israeli authorities have accused the defendant of conspiring with others to murder the leader of the Musli Gang. Israel has requested Hiya's extradition on two counts of attempted murder, among other charges; that extradition case is pending in this District.

counsel, conceding in a statement to Pretrial Services that he has substantial assets. Magistrate Judge Valerie Figueredo appointed counsel from the Federal Defenders to represent the defendant solely for purposes of presentment, arraignment, and the initial bail hearing. The defendant temporarily consented to detention without prejudice and asked the Court to schedule a bail hearing on May 20, 2024.

Also on May 14, 2024, the Government advised counsel from the Federal Defenders by email that the Government had certain property belonging to the defendant and asked whether temporarily appointed counsel from the Federal Defenders would accept that property or if the Government should provide it to retained counsel, if the Government determined that it lacked evidentiary value. To ensure that the defendant's particularly valuable items (the cash, Rolex watch, and Louis Vuitton bag) were turned over as quickly as possible, FBI agents followed up with counsel later that day. As instructed by the Federal Defenders, an FBI agent provided the defendant's cash, watch, and bag to an Israeli attorney who represents the defendant in connection with a different case.

At the bail hearing on May 20, 2024, counsel from the Federal Defenders continued to represent the defendant, who had not yet retained counsel. Magistrate Judge Jennifer E. Willis found the defendant to be a flight risk and ordered that he be detained. Appointed counsel then orally moved for the return of the Devices pursuant to Rule 41(g). The Government opposed the oral motion, noting that the Magistrate Court lacked jurisdiction over any such motion, which was outside the scope of this Court's referral. Magistrate Judge Willis agreed and denied the motion, without prejudice to renewal before this Court.

On May 28, 2024 (15 days after the FBI obtained the Devices), the Government requested a warrant for the Devices, and the next day, Magistrate Judge Ona T. Wang issued the search warrant. On May 30, 2024, since the defendant had not yet retained an attorney, the Government emailed the warrant to appointed counsel and reiterated the offer to return items lacking evidentiary value. On June 7, 2024, retained counsel filed a notice of appearance.

On July 3, 2024, the defendant filed the Motion. (Dkt. 19; *see also* Government's Opposition, Dkt. 22; Defense Reply, Dkt. 23; Defense Notice of Supplemental Authority, Dkt. 24). The Motion argued that the Devices were unconstitutionally seized and searched for three reasons. It asserted that Malaysian officials acted without lawful authority, that the warrant for the Devices signed by Judge Wang was not supported by probable cause, and that the 15-day period from when the Government seized the Devices until when it requested a warrant for the Devices was an unconstitutionally unreasonable delay.

While the Motion has been pending, the parties have met and conferred in an effort to resolve the dispute. The Government informed defense counsel that the Devices fall into two groups: those the Government has been able to access and those that remain encrypted. (The Government produced the extractions it was able to obtain.) The Government offered to return the Devices it was able to access, if the defense agreed to stipulate to the authenticity of the Government's extractions. The defense agreed to do so, and those Devices have been returned. As to the Devices that remain encrypted, the Government

agreed to return them if the defense (a) provides the information necessary to access the Devices (*e.g.*, PIN or passcode) and (b) stipulates to the authenticity of the Government's extractions. The defense declined to provide the information necessary to access the Devices.

The Court referred the Motion to Magistrate Judge Netburn, (Dkt. 25), who held a conference on September 4, 2024. On September 24, 2024, Judge Netburn issued a Report and Recommendation, finding that "the search warrant is supported by probable cause and the Government's delay in seeking a search warrant once the property was in U.S. custody was not unreasonable." (Report and Recommendation 1). Judge Netburn "reserve[d] on the question whether the U.S. law enforcement cooperation with the Malaysian officials implicates constitutional restrictions," and on whether "an evidentiary hearing" would be required to resolve that question. (*Id.*).

On October 9, 2024, the defendant objected to Judge Netburn's Report and Recommendation, arguing that Judge Netburn and Judge Wang both erred in finding probable cause and that Judge Netburn erred in assessing whether the Government acted with reasonable promptness in seeking a warrant.

C. Applicable Law

Because the Court referred the Motion to Judge Netburn pursuant to Federal Rule of Criminal Procedure 59(b)(1), (*see* Dkt. 25), the Court "must consider de novo any objection to the magistrate judge's recommendation." Any objection not raised by the defendant is waived. *See United States v. Ballares*, 317 F. App'x 36, 38 (2d Cir. 2008).

Federal Rule of Criminal Procedure 41(g) authorizes "[a] person aggrieved by an unlawful search and seizure of property" to "move for the property's return" in "the district where the property was seized." To prevail on a Rule 41(g) motion, the defendant "must demonstrate that (1) he is entitled to lawful possession of the seized property; (2) the property is not contraband; and (3) either the seizure was illegal or the government's need for the property as evidence has ended." *Ferreira v. United States*, 354 F. Supp. 2d 406, 409 (S.D.N.Y. 2005) (internal citations and quotation marks omitted). The defendant, as the moving party, bears the burden of proving these three elements by a preponderance of the evidence. *United States v. Seabrook*, No. 16 Cr. 467 (AKH), 2021 WL 965772, at *2 (S.D.N.Y. Mar. 15, 2021). Where, as here, the defendant argues that "the property in question was illegally seized, the motion has typically been treated as an interlocutory suppression motion." *Allen v. Grist Mill Cap. LLC*, 88 F.4th 383, 394 (2d Cir. 2023). Rule 41(g) thus functions as "a method for enforcing the protection against unreasonable search and seizure guaranteed by the Fourth Amendment." *Id.* (quoting 3A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 690 (4th ed. 2023)).

The Fourth Amendment mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "While 'probable cause is a fluid concept—turning on the assessment of probabilities in particular factual

Case 1:24-cr-00282-VM   Document 34   Filed 10/23/24   Page 5 of 11

Page 5

contexts—not readily, or even usefully, reduced to a neat set of legal rules,' it is generally understood that 'probable cause to search is demonstrated where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Elkorany*, No. 20 Cr. 437 (NRB), 2021 WL 3668086, at *2 (S.D.N.Y. Aug. 17, 2021) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *Walcyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)). "Probable cause is not a high bar." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (citations and internal quotation marks omitted).

A defendant "who argues that a warrant was issued on less than probable cause faces a heavy burden." *Rivera v. United States*, 928 F.2d 592, 602 (2d Cir. 1991). Due to the "subjective" nature of probable cause determinations, *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015), "[a] reviewing court must accord substantial deference to [a magistrate's finding] that probable cause exists." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (citing cases). This deferential standard reflects the reality that "[r]easonable minds frequently may differ on the question whether a particular affidavit establishes probable cause." *United States v. Leon*, 468 U.S. 897, 914 (1984). Even in cases where the existence of probable cause is marginal, resolution "should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (citations and internal quotation marks omitted). Indeed, a "magistrate's finding of probable cause is itself a substantial factor tending to uphold the validity of [a] warrant"—particularly in "close cases where doubts should be resolved in favor of upholding the warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983) (citing cases). "'Where the circumstances are detailed . . . and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner. The resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.'" *Rivera*, 928 F.2d at 602 (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965) (alterations omitted)). "The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *Wagner*, 989 F.2d at 72; *see also Raymonda*, 780 F.3d at 113; *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015).

D. Discussion

For the reasons set forth in the Government's July 17, 2024, opposition to the Motion (Dkt. 22), and as explained herein, Judge Netburn's conclusions are supported by the facts and the law.

1. *Judges Netburn and Wang Correctly Found Probable Cause*

Hiya first argues that Judges Netburn and Wang erred in finding that the warrant was supported by probable cause. He is mistaken.

"[T]he magistrate's finding of probable cause is entitled to substantial deference." *Travisano*, 724 F.2d at 345. Probable cause for a search warrant exists when there is "a fair

probability that the [item to be searched] will yield the objects specified in the search warrant." *Id.* at 346. (citing *Illinois v. Gates*, 462 U.S. 213, 245 (1983); *see also id.* ("[T]he standard used by a reviewing court [must not] be so stringent, technical or grudging as to discourage the use of search warrants. . . . [T]he [search warrant] should be read practically and in a commonsense fashion.")).

Here, for the reasons stated in the affidavit of FBI Special Agent Jennifer Lewis, attached as Exhibit A to the Motion (the "Affidavit" or "Aff.")—and the Complaint in this action, which the Affidavit incorporated by reference—there was more than "a fair probability" that the defendant's electronic devices contained evidence both of his electronic procurement, manipulation, and submission of falsified documents to U.S. State Department officials and of his correspondence with co-conspirators about the same.

The defense does not deny that the Affidavit and Complaint establish probable cause to believe that the defendant committed the charged offenses. As explained more fully in the Complaint, on or about August 23, 2022, the defendant applied for passports and other documents to demonstrate that his two children are U.S. citizens, when, in fact, they are not. In support of the application, the defendant falsely stated, under oath or affirmation, that he had been present in the United States on particular dates when, in fact, he had not. (Complaint 3). And on at least two separate occasions in 2023, the defendant himself or through counsel submitted falsified documents to U.S. State Department officials. These falsified records, which the defendant acquired with the help of one or more co-conspirators, purported to show that he was present in the United States on particular days when, in fact, he was not.

Rather than disputing that probable cause exists to believe that he committed the charged offenses, the defendant challenges the "'nexus between the criminal activities alleged' and the location or items searched." (Mot. 4 (quoting *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004); *see also* Objections 3-6 (reiterating this argument)). But, as Judges Netburn and Wang correctly found, there is a clear nexus between the Devices and the two charged offenses.

For one thing, the defendant carried out the substantive crime of unlawfully applying for and attempting to procure U.S. citizenship, in part, through electronic communications. Many of the false statements and fake documents were transmitted electronically. For example, on November 13, 2023, the defendant sent an email to U.S. State Department officials that included, as attachments, the same manipulated medical records, falsified school transcripts, and false affidavits that he had obtained with the help of one or more co-conspirators. (Complaint 3-4; Aff. 4-5). There is, therefore, a "fair probability" that the defendant used his personal electronic devices to procure the fake documents, manipulate them, and/or transmit them to U.S. immigration officials. Judge Netburn's ruling specifically relied on this email, observing that "[t]t is reasonable to believe that this email was sent on one of the Devices (which all had email capability) and/or that the attachments were stored on the Devices." (Report and Recommendation 6). The defense objects to Judge Netburn's reliance on this email because about six months passed between the email and the seizure of the Devices. As Special Agent Lewis explained

in her affidavit, however, "where computers are used in furtherance of criminal activity, evidence of the criminal activity can often be found for months or even years after it occurred." Aff. ¶ 16.

The defendant also used electronic communications to carry out the other charged offense, conspiracy. As described in the Affidavit, one of the documents the defendant submitted to U.S. immigration officials was a letter signed before a notary by a close family friend of the defendant. That affidavit lied about the dates when the defendant lived in the United States. Another false document was a letter signed by another person ("Affiant-1") before a notary public, stating that Affiant-1 and the defendant had been roommates at a particular time in New York, New York. Affiant-1 later told U.S. law enforcement officials that Affiant-1 does not know the defendant and that they were never roommates. Affiant-1 explained that the affidavit was drafted by the close family friend and that Affiant-1 signed it at her urging. (Aff. 5-6). The sworn statements by the close family friend and Affiant-1 were both included in the materials electronically submitted by Hiya to immigration officials. Judge Netburn correctly found, in light of the false statements that Hiya made and the falsified records that he submitted, that there was "a fair probability that the Devices will contain the falsified records and communications with counsel or co-conspirators regarding the false information." (Report and Recommendation 6).

The defendant argues that this evidence was nothing more than "blanket generalizations about how people who commit crimes act," (Objections 4 (internal quotation marks and citation omitted)), relying heavily on Judge Gardephe's recent decision in *United States v. Silva*, No. 22 CR. 347 (PGG), 2024 WL 3488305 (S.D.N.Y. July 19, 2024), *appeal filed* (2d Cir. Aug. 19, 2024). There, Judge Gardephe suppressed a cellphone, holding that "[t]he Government's contention that [the defendant] communicated with fellow gang members over the seized cellphone – and that evidence of those communications will likely be found on that cellphone – rests on no more than a 'hunch,'" which was "premised on the notion that because cellphones have become ubiquitous and indispensable in daily life, anyone engaged in conspiratorial criminal activity would likely use his cellphone in connection with or to facilitate that criminal activity." *Id.* at *6. But even if *Silva* were correctly decided—and the Government has filed an appeal of that decision—it is nothing like this case. Here, as explained more fully above, Special Agent Lewis's affidavit was based on far more than a hunch: the particularized evidence in Special Agent Lewis's Affidavit establishes that specific false documents were created and subsequently transmitted electronically in furtherance of the subject offenses. In short, the Affidavit did not concern what "anyone engaged in conspiratorial activity" would have done; it concerned what the defendant, and others acting in concert with him, did in *this* case. As Judge Netburn observed, for example, "evidence of the charged offenses was found in an email sent by Hiya," and the email "included false statements and attached falsified documents." (Report and Recommendation 5-6). Accordingly, "[i]t is reasonable to believe that this email was sent on one of the Devices (which all had email capability) and/or that the attachments were stored on the Devices." (*Id.* at 6). Given the specificity of the allegations in Special Agent Lewis's affidavit, *Silva* is distinguishable.

For these reasons, Judges Netburn and Wang correctly concluded that the warrant

was supported by probable cause.

### 2. The Government Acted with Sufficient Promptness

The defendant also objects to Judge Netburn's finding that the Government's delay in seeking the warrant was constitutional. Again, Judge Netburn reached the right result.

The Second Circuit has explained that "four factors are generally relevant to whether the police have waited an unreasonable amount of time before seeking a search warrant." *Smith*, 967 F.3d at 206. Those factors are: "[1] the length of the delay, [2] the importance of the seized property to the defendant, [3] whether the defendant had a reduced property interest in the seized item, and [4] the strength of the state's justification for the delay." *Id.* (brackets in original). The factors must be viewed wholistically and "essentially seek to balance the individual's possessory interest against the government's continuing interest in retaining the property for investigation or prosecution." *Id.* at 206 n.1[2]

Here, none of the four *Smith* factors suggests an unconstitutionally protracted delay. Most importantly, the amount of time taken by the Government to seek a warrant— approximately two weeks—was not unusual. FBI agents took custody of the devices on Monday, May 13 (local time in Kuala Lumpur), flew with them for about 24 hours, and brought them to the FBI's offices in this District late that night. Fifteen days later (the fourteenth day being Memorial Day), the Government requested a warrant, which was issued on the sixteenth day. An approximately two-week period between the Devices' seizure and the Government's application for a search warrant falls comfortably within the realm of reasonableness and comes nowhere close to the month-long delay the Court held unreasonable in *Smith*. Indeed, courts have found far longer delays reasonable under the circumstances. *See, e.g.*, *United States v. Chang*, No. 18 Cr. 0681 (NGG), 2024 WL 1308775, at *10 (E.D.N.Y. Mar. 27, 2024) (42-day delay); *United States v. Corbett*, No. 20 Cr. 213 (KAM), 2021 WL 4480626, at *7 (E.D.N.Y. Sept. 30, 2021) (101-day delay); *United States v. Green*, No. 18 Cr. 121, 2021 WL 1877236, at *6 (W.D.N.Y. Feb. 3, 2021), report and recommendation adopted, 2021 WL 1856949 (W.D.N.Y. May 10, 2021) (3-month delay); *In re Application for Search Warrant*, 527 F. Supp. 3d 179, 185 (D. Conn. 2020) (51-day delay); *United States v. Sharma*, No. 18 Cr. 340 (LGS), 2019 WL3802223, at *6-*7 (S.D.N.Y. Aug. 13, 2019) (3-month delay).

In addressing this factor, Judge Netburn, who has ample experience with search

---

[2] Even where there is a Fourth Amendment violation, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Thus, the exclusionary rule appropriately applies only when law enforcement has shown "deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights" or has engaged in misconduct that is the product of systemic negligence. *Davis v. United States*, 564 U.S 229, 238 (2011) (quoting *Herring*, 555 U.S. at 144) (internal quotation marks omitted). Evidence is not to be suppressed when the constitutional violation was the "product of isolated simple negligence." *Smith*, 967 F.3d at 211-12.

warrant applications, offered the following observation:

> That type of time frame we see pretty routinely in this court where people are arrested maybe by NYPD. The case is transferred over to the feds. The device is held in the Southern District's office, and some period of time later, the warrant is requested. Sixteen days doesn't seem to me sort of radically outside the norm there.

(Sept. 4, 2024, Tr.). Judge Netburn ultimately found this factor to be "neutral," a finding the defendant does not dispute. (Objections 6).

The second and third *Smith* factors, "the importance of the seized property to the defendant" and "whether the defendant had a reduced property interest in the seized item," also offer no help to the defendant. He has been detained since his arrest, so the Devices *cannot* be returned to him personally. For that reason, he has a sharply diminished possessory interest in the Devices, as courts have consistently held in similar circumstances. *See, e.g.*, *United States v. Sullivan*, 797 F.3d 623, 635 (9th Cir. 2015) (finding reduced interest, in part, because defendant "was in custody the entire time"); *United States v. Bragg*, 44 F.4th 1067, 1071-72 (8th Cir. 2022) (finding defendant had reduced interest because of his "arrest and detention"); *United States v. Johnson*, 875 F.3d 1265, 1276 (9th Cir. 2017) (finding reduced interest because defendant was in "continuous custody"); *United States v. Shaw*, 531 F. App'x 946, 949 (11th Cir. 2013) (finding reduced interest because defendant was "in custody throughout" the delay). Tellingly, the defense cites no case where a court has ever suppressed evidence due to an unreasonable delay obtaining a warrant when the defendant was in custody throughout the duration of that delay. By the same token, the defendant's "continued inability to possess or use the cell phones while incarcerated significantly diminishes the importance of their prompt return." *Green*, 2021 WL 1877236, at *6; *see also In re Application for Search Warrant*, 527 F. Supp. 3d at 185 (concluding, in *Smith* analysis, that the importance of the seized property to the target weighed "strongly" in favor of the Government, where "the target ha[d] been criminally charged and remain[ed] detained pending trial" and, accordingly, would have been "unable to make use of the [subject] devices, even if they had not been seized").

The defendant claims that the Devices "may be of use to his counsel or family members while he is in custody" and belatedly seeks a hearing on this issue. (Objections 6). Insofar as the Devices are relevant to preparation of the defense, the Government has produced to defense counsel the full extractions it has been able to obtain. And the defendant's reliance on *other people's* putative interests in his Devices lacks any basis in the law. *Smith* speaks only of "the importance of the seized property *to the defendant*," 967 F.3d at 206 (emphasis added)—a sensible limitation since others, of course, lack standing to challenge the search.

The fourth factor, the "justification for the delay," also favors the Government, which had adequate reasons for the modest delay in this case. After presentment, the prosecution team focused on the contested bail hearing. Given the dangers that would have been posed by the defendant's release, including because he is the head of a major Israeli

organized-crime family who pled guilty in the past for his role in the murder of a potential witness (a former Israeli police officer) and the attempted murder of the witness's girlfriend, and because the defendant poses a serious flight risk, the prosecution team's focus on the bail hearing in the immediate aftermath of the defendant's arrival in the United States was reasonable. That hearing took place on Monday, May 20. The following Monday was Memorial Day, and the Government submitted its application for a warrant the next day, Tuesday, May 28. Under the circumstances, the Government fully complied with the Constitution by seeking the warrant within 15 days.

Judge Netburn found that the fourth factor "conclusively favors Hiya" because the Government's "contention that it was focused on the May 20 bail hearing is dubious, and the Government also fails to account for the additional eight days thereafter that it waited before presenting the warrant application." (Report and Recommendation 11). The Government respectfully disagrees. Although the charges in this case are non-violent, as noted above, Israeli authorities have accused the defendant of conspiring with others to murder the leader of the Musli Gang, and Israel has requested Hiya's extradition on two counts of attempted murder, among other charges. Given these charges and the defendant's prior conviction for his role in a murder and an attempted murder, there is nothing dubious about the Government's focus on the bail hearing.

In any event, the Court need not decide whether Judge Netburn correctly determined that the fourth factor favors Hiya because even if it does, as Judge Netburn found, the Government acted with constitutionally sufficient promptness.

### 3. There Is No Need for a Stay

Finally, the Court should reject the defendant's request to stay execution of the warrant pending resolution of the Motion. The defendant relies on "the 'traditional authority' of the courts to preserve the status quo while considering matters before it." (Objection 7) (quoting *Miller v. French*, 530 U.S. 327, 336 (2000)). But an equitable stay is an extraordinary remedy. Before entering equitable relief, courts consider factors such as the likelihood of success, the likelihood of irreparable injury, and the balance of the equities. *See, e.g.*, *Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020) ("Ordinarily, to obtain a preliminary injunction against governmental action taken pursuant to a statute, the movant has to demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction.'" (citation omitted)); *cf. Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 929 (2024) (Kavanaugh, J., concurring) ("This Court has used different formulations of the factors for granting emergency relief. All formulations basically encompass (1) likelihood of success on the merits (or a fair prospect of success); (2) certworthiness; (3) the harms to the parties; and (4) the equities and public interest.").

Here, for reasons already stated, the defendant has shown no likelihood of success on the merits. He has, moreover, shown no likelihood of irreparable injury. As Judge Netburn observed in denying the defendant's request for a stay, "Should the district judge decline to adopt my recommendation, or should the Court's consideration for the foreign

law enforcements' conduct implicate constitutional restrictions, Hiya may still have a remedy through suppression and exclusion of the evidence." (Report and Recommendation 13). The balance of the equities strongly favor the Government. A grand jury has charged the defendant with violating federal law. Two magistrate judges have found probable cause to believe that his Devices will contain evidence. Under such circumstances, the equities favor allowing the Government to continue its investigation.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/ James Mandilk

James Mandilk
Assistant United States Attorney
Tel: (212) 637-2453

cc: Counsel of Record (by ECF)