UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

UNITED STATES OF AMERICA,

24-CR-0282 (VM)(SN)

-against-

OPINION & ORDER
AND
REPORT &
RECOMMENDATION

ERAN HIYA,

Defendant.

------------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge.

TO THE HONORABLE VICTOR MARRERO:

Defendant Eran Hiya ("Hiya") moves under Federal Rule of Criminal Procedure 41(g) for an order returning property seized at the time of his arrest in Malaysia. The Honorable Victor Marrero referred this motion to me for a report and recommendation. ECF No. 25. The Court previously found that the search warrant was supported by probable cause and that the Government's delay in seeking a search warrant once the property was in U.S. custody was not constitutionally unreasonable. ECF Nos. 31, 37. The question now before the Court is whether the Malaysian authorities acted as agents of the United States in connection with Hiya's arrest, implicating constitutional restrictions. ECF No. 37. In connection with this inquiry, Hiya moves to compel disclosure of certain communications between the FBI and Malaysian government officials and for an evidentiary hearing.

Hiya's motion to compel disclosures and for an evidentiary hearing is DENIED. On the current record, I recommend that the Court DENY Hiya's motion under Rule 41(g).

## BACKGROUND

The Court assumes the parties' familiarity with the case and provides only a brief summary of the relevant facts for context. Hiya was arrested by the Royal Malaysian Police ("RMP") in Malaysia on April 4, 2024. At the time of his arrest, the RMP seized five devices. Hiya alleges that, in violation of the Fourth Amendment, Malaysian authorities did not justify his arrest or the seizure of his property, did not offer a meaningful legal process to challenge his detention, and largely denied him access to counsel.

Documents produced by the Government to Hiya demonstrate that United States officials and Malaysian officials had some contact regarding Hiya in the months before and days after his arrest. On January 10, 2024, almost three months before Hiya was arrested by Malaysian authorities, a Malaysian-based FBI agent sent a two-page inquiry to the Malaysian police requesting information on Hiya, including immigration records and police reports regarding a stabbing incident that occurred in Malaysia. ECF No. 45-2. About a month later, the RMP responded to the request and noted that it had no profile on Hiya but was aware that he was in the country from October 25, 2023, to December 7, 2023. ECF No. 45-3. Hiya was later arrested by the RMP on April 4, 2024. Between April 5 and April 10, members of the Southern District of New York United States Attorney's Office and various local and foreign-based FBI agents, including agents based in Malaysia, exchanged emails indicating that the United States did not know if Hiya had been arrested, and if so, on what grounds. See ECF No. 45-4. Emails during this period suggest that the United States was working to file charges against Hiya and have him deported to the United States.

By April 11, 2024, an arrest warrant was issued out of the Southern District of New York based on a criminal complaint, and by April 15, 2024, the FBI requested that Hiya be transferred from the custody of the RMP to the FBI for deportation to the United States. ECF No. 45-5.

After April 15, the same FBI agents and members of the United States Attorney's Office continued communicating about Hiya, including about whether the Malaysian government was willing to deport Hiya to the United States. ECF No. 45-7.

Hiya was subsequently indicted by a grand jury on one count of conspiracy to unlawfully apply for and attempt to procure U.S. citizenship, 18 U.S.C. § 371, and one count of unlawfully applying for and attempting to procure U.S. citizenship, 18 U.S.C. § 1425. On May 13, 2024, the Government took Hiya into custody from the Malaysian authorities and brought him to the United States. When the Malaysian authorities transferred custody of Hiya, the Government also took custody of his devices.

Hiya moved for the return of his property pursuant to Federal Rule of Criminal Procedure 41(g). He argued that: (1) the seizure of his devices by the Malaysian authorities was unconstitutional, and that this conduct must be imputed to the U.S. Government; (2) the U.S. warrant to search his devices was not supported by probable cause; and (3) the Government's delay in seeking a search warrant was constitutionally unreasonable. The Court previously rejected the second and third arguments. ECF Nos. 31, 37. The final question is whether the seizure of his devices was unconstitutional because the Malaysian authorities' conduct must be imputed to the U.S.

## DISCUSSION

### I.    The Motion to Compel

Hiya moved to compel production of "all communications between the United States (*i.e., any U.S. government official*) and Malaysia relating to Mr. Hiya." ECF No. 45, at 3 (emphasis in original). As part of this request, Hiya specifically seeks communications from two FBI representatives in Malaysia: Legal Attaché Khangura and Assistant Legal Attaché Wu, the FBI's principal points of contact with Malaysian officials.

**A. Applicable Law**

"In a criminal prosecution . . . the government has independent disclosure obligations, including under Rule 16 of the Federal Rules of Criminal Procedure and <u>Brady v. Maryland</u>." <u>Jabar v. U.S. Dep't of Just.</u>, 62 F.4th 44, 49 (2d Cir. 2023); <u>see also</u> <u>United States v. Smith</u>, 629 F. App'x 57, 60 (2d Cir. 2015) (describing the "broad duties to disclose evidence to a defendant in a criminal case" as arising under Rule 16 and <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)). Under <u>Brady</u>, the prosecution has an affirmative duty to disclose favorable, material evidence to criminal defendants, but the Constitution does not "demand[] an open file policy." <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995). Under Rule 16, the Government has a duty to disclose evidence that is material and "within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E)(i).

Hiya argues that communications between Malaysian officials on the one hand, and Khangura and/or Wu on the other, are discoverable under <u>Brady</u> and Rule 16. He does not, however, contend that these communications are likely to be exculpatory (and there is no evidence or suggestion that they relate in any way to the passport fraud charges).[1] Instead, he argues that Government's "open-ended affirmative duty to search for exculpatory material" under <u>Brady</u> extends to Khangura and Wu. Alternatively, even under the discovery obligations of Rule 16, Hiya argues that the Government must produce these documents. ECF No. 56. Finally, Hiya argues that these documents must be produced as a matter of fairness to allow Hiya to prove his agency argument under <u>United States v. Getto</u>, 729 F.3d 221 (2d Cir. 2013).

---

[1] "The basic rule of <u>Brady</u> is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." <u>United States v. Coppa</u>, 267 F.3d 132, 139 (2d Cir. 2001) (quoting <u>Brady</u>, 373 U.S. at 87).

### B.  The Meaning of "the Government"

It is an open question in the district courts of this Circuit whether the meaning of "the government" within the Brady context applies in the Rule 16 context, and therefore whether the "prosecution team" analysis under Brady applies in Rule 16 cases. Compare United States v. Chalmers, 410 F. Supp. 2d 278, 289 (S.D.N.Y. 2006) ("[T]he Court is not persuaded that the 'government' for purposes of Rule 16 should be any broader than the 'prosecution team' standard that has been adopted in the Brady line of cases."), and United States v. Alexandre, No. 22-cr-326 (JPC), 2023 WL 416405, at *13 (S.D.N.Y. Jan. 26, 2023) ("The Court has already concluded herein that the Government's mere ability to access documents in the hands of other agencies does not evoke a joint investigation for Brady purposes, and holds the same in the Rule 16 context.") (citation omitted), with United States v. Ghailani, 687 F. Supp. 2d 365, 371 (S.D.N.Y. 2010) ("Rule 16 and Brady in fact serve different purposes, and it is far from clear that their definitions of 'the government' are or should be identical."). While the law is not settled on this question, the decisions of district courts in this Circuit suggest that the "prosecution team" analysis employed under Brady can still be helpful in determining the scope of the Government's "possession, custody, or control" under Rule 16.

### C.  Rule 16

Rule 16 has two requirements: (1) the item is in the Government's possession, custody, or control; and (2) the item is material to preparing the defense, the Government intends to use the item in its case-in-chief, or the item was obtained from or belongs to the defendant. Fed. R. Crim. P. 16(a)(1)(E)(i)-(iii).

#### 1.  Possession, Custody, or Control

In analyzing the first prong of Rule 16, the Court must determine whether communications by Khangura and Wu with the Malaysian government are within the

5

Government's "possession, custody, or control." "[W]hether the Government's disclosure duty extends to evidence maintained by another federal agency depends on whether the agency is an arm of the prosecutor or part of the prosecution team." United States v. Morgan, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) (internal quotation marks omitted). The Court of Appeals has cautioned that the determination of whether an individual is an "arm of the prosecution" does not follow a "broad, categorical approach." United States v. Stewart, 433 F.3d 273, 298 (2d Cir. 2006). Instead, "the relevant inquiry is what the person *did*, not who the person *is*." Id. (emphases in original).

In assessing "what a person did," the Court of Appeals has explained that "[i]ndividuals who perform investigative duties or make strategic decisions about the prosecution of the case are considered members of the prosecution team, as are police officers and federal agents who submit to the direction of the prosecutor and participate in the investigation." United States v. Barcelo, 628 F. App'x 36, 38 (2d Cir. 2015). In interpreting these standards, courts in this District have evaluated the level of interaction between the prosecutor and the individual alleged to be part of the prosecution team. United States v. Meregildo, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013). For example, "investigating case agents are part of the prosecution team but agents of a separate organization or sovereign who are uninvolved in the investigation are not." Id. The court in Meregildo set forth the relevant considerations:

> [T]he prosecution team does not include federal agents . . . who are not involved in the investigation. And, even when agents are involved in the investigation, they are not always so integral to the prosecution team that imputation is proper. Interacting with the prosecution team, without more, does not make someone a team member. Instead, under the totality of the circumstances, the more involved individuals are with the prosecutor, the more likely they are team members. Among many others, these circumstances include whether the individual actively investigates the case, acts under the direction of the prosecutor, or aids the prosecution in crafting trial strategy.

Id. at 441-42 (citations omitted).

Under this standard, Hiya has failed to establish that Khangura and Wu are members of the prosecution team. The evidence submitted by both parties demonstrates that these agents did not perform investigative duties or make strategic decisions. They transmitted routine information requests before Hiya's arrest. See ECF Nos. 45-2, 45-3. After his arrest, they operated as liaisons between the prosecution team and the Malaysian authorities. See ECF No. 45-4, at 2-5. Khangura and Wu coordinated with Malaysian officials on behalf of the prosecution team, but they were not "so integral to the prosecution team that imputation is proper." Meregildo, 920 F. Supp. 2d at 441. There is no indication that they investigated the passport fraud case, crafted prosecutorial strategy, or participated in witness interviews. There is evidence that Wu drafted a document, approved by Khangura, that summarized a general profile of Hiya submitted to the RMP as an FBI information request. See ECF No. 45-2. But this report does not reflect any strategic decisions about how to prosecute this case. See United States v. Saipov, No. 17-cr-722 (VSB), 2023 WL 3495031, at *4 (S.D.N.Y. May 16, 2023) (finding that FBI field offices that produced agency-wide reports upon the prosecution's request were not members of the prosecution team). Not one of the communications reviewed by the Court suggests that Khangura and Wu were involved in making strategic decisions on the prosecution of this case.

Hiya argues that the agents "submit[ted] to the direction of the prosecutor" because an FBI agent on the prosecution team sent an email asking Wu to obtain the Malaysian authorities' position on Hiya's deportation to the United States. See ECF No. 56, at 1-2. But asking a foreign-based FBI agent to send inquiries to officials of the host country does not make him an "arm of the prosecution." "It strains credulity to suggest that FBI employees . . . submit[ted] to the direction of the prosecutor on the basis of their response to several emails and their willingness to hold a few isolated telephone conversations with the Government." Morgan, 302 F.R.D. at 306 (internal quotation marks omitted). Even if Hiya could establish that "it is

plausible . . . that these FBI employees 'aid[ed] in the Government's investigation,'" id. (quoting Meregildo, 920 F. Supp. 2d at 441), aiding the Government is not enough, see id. at 306-307 ("However, the extent of any aid the FBI employees provided was limited to the content of their communications with the prosecutors. The Court is not persuaded that the entire FBI . . . thus became part of the prosecution team, and therefore, there is no reason to impute to prosecutors knowledge of any evidence in the possession of the FBI as a whole."). Under the totality of the circumstances, Khangura and Wu cannot be deemed members of the prosecution team.

Because Khangura and Wu are not members of the prosecution team, it follows that their alleged communications with the Malaysian government are not within the Government's "possession, custody, or control." Rule 16 contains "no constructive possession concept or due diligence requirement." United States v. Bradley, 105 F. 4th 26, 35 (2d Cir. 2024). The Court of Appeals has cautioned district courts not to adopt a "monolithic view" of government that would "condemn the prosecution of criminal cases to a state of paralysis." United States v. Avellino, 136 F.3d 249, 255 (2d Cir. 1998). Khangura and Wu operate through a different part of the federal government, separate from the prosecution team, and the language of "the government" in Rule 16 cannot be so broad as to encompass them. See Chalmers, 410 F. Supp. 2d at 289. Therefore, Hiya cannot meet the requirements of Rule 16, and the Government need not produce the communications from Khangura and Wu.

United States v. Stein and United States v. Giffen—cases cited by Hiya—do not compel a different result. In Stein, the court held that the government had "control" within the meaning of Rule 16 when it had a "legal right" to certain documents held by a firm with which it had entered into a deferred prosecution agreement. 488 F. Supp. 2d 350, 362-63 (S.D.N.Y. 2007). The Court of Appeals has limited this holding to situations where the government has a *right* to obtain

evidence from a third party pursuant to an agreement. See Bradley, 105 F.4th at 35 n.5 (refusing to examine Stein because no agreement existed in the case).

In Giffen, the court concluded that documents that the government has "reviewed or has access to must be provided." 379 F. Supp. 2d 337, 343 (S.D.N.Y. 2004). Thus, it ordered the production of documents from two Executive Branch agencies that the government acknowledged it had reviewed as part of its investigation. "Although in Giffen the Court arguably espoused a broad view of 'access' to documents, the Court ultimately held only that the prosecution was required to disclose CIA and Department of State documents that it *had actually reviewed*." Chalmers, 410 F. Supp. 2d at 289 (emphasis added). See also United States v. Finnerty, 411 F. Supp. 2d 428, 434 (S.D.N.Y. 2006) (Giffen "held only that the prosecution was required to disclose CIA and Department of State documents that it had *actually reviewed*") (emphasis added). The Giffen court delineated, however, that the prosecutor need not "produce documents from agencies that did not participate in the investigation of the defendant or documents of which it is unaware." 379 F. Supp. 2d at 343 (citing Avellino, 136 F.3d at 255). Here, there is no suggestion that the prosecuting attorneys reviewed or even had access to the communications between Malaysian-based FBI Agents Khangura and Wu, and the Malaysian government. Thus, even under an expansive reading of Giffen, these communications are not within the Government's control.

Finally, the Court has considered United States v. Ghailani. Ghailani, an alleged member of Al Qaeda, was charged with conspiracy to kill Americans abroad. Following his arrest, Ghailani was held in CIA custody before being transported to the Guantanamo Bay detention camp. Pursuant to Rule 16, he sought, among other things, communications between the CIA, FBI, other intelligence agencies, the Department of Justice, and certain Executive Branch officials relating to his detention at a CIA black site and then the decision to transfer him to

Guantanamo Bay, Cuba. The court considered whether "the government" extended beyond the United States Attorney's Office and the trial team "up into Main Justice and the FBI and, if so, how far." 687 F. Supp. 2d at 370. It found that certain officials within the Department of Justice who were involved in the detention and transfer decisions were "sufficiently involved with the prosecution properly to be considered 'the government' for Rule 16 purposes." Id. at 372. "Even if those officials had no other involvement with Ghailani's investigation or prosecution, the decisions at issue were so important to the timing and progress of this case that participation in the decisionmaking renders those individuals" part of "the government" for the purposes of Rule 16. Id.

The Malaysian authorities arrested Hiya, and there is no evidence that that Khangura and Wu played any role in that decision. Indeed, the evidence suggests that they were unaware of his arrest until after it happened. And, although these agents assisted the AUSA with information-sharing related to Hiya's deportation, that decision is not "so important to the timing and progress" of Hiya's passport fraud case to render the Malaysian-based FBI agents members of the prosecution team.

For all these reasons, the communications between Khanguara and Wu, on the one hand, and Malaysian officials, on the other hand, are not within the Government's "possession, custody, or control" within the meaning of Rule 16, and the Government need not search for and produce them.

## 2. Materiality

The parties do not address the second prong under Rule 16, whether the documents sought would be material to preparing Hiya's defense. Fed. R. Crim. P. 16(a)(1)(E)(i); see United States v. Maniktala, 934 F.2d 25, 28 (2d Cir. 1991) (a defendant has the burden of making a *prima facie* showing of materiality). Because Hiya has not established that the

communications he seeks are within the Government's "possession, custody, or control," I decline to address materiality.

## II. Constitutional Implications of the Seizure

Hiya argues that his devices should be returned because they were seized unlawfully by Malaysian authorities. The Fourth Amendment's exclusionary rule does not apply to evidence obtained by searches conducted abroad by foreign officials. United States v. Lee, 723 F. 134, 139 (2d Cir. 2013). But U.S. law enforcement cooperation with foreign law enforcement may implicate constitutional restrictions where the foreign agents are deemed to be agents or virtual agents of the United States. Getto, 729 F.3d at 227-28.

### A. Evidence of Cooperation Between the United States and Malaysia

Hiya argues that he is entitled to discovery of communications between the foreign-based FBI agents and the host country authorities to avoid "nullify[ing] the agency doctrine outlined in United States v. Getto, 729 F.3d 221 (2d Cir. 2013), and its progeny." ECF No. 56, at 3. Hiya does not cite any cases that have found that a defendant seeking to hold foreign law enforcement officials as U.S. agents subject to the Constitution is entitled discovery beyond Rule 16 or Brady. Hiya notes, however, that a prosecutor "is not allowed to avoid disclosure of evidence by the simple expedient of leaving relevant evidence to repose in the hands of another agency while utilizing his access to it in preparing his case for trial." Giffen, 379 F. Supp. 2d at 342 (internal quotation marks and citations omitted). Because Hiya has not offered any evidence that the Government was "utilizing" these communications to prepare its case, he has not established a sufficient foundation to justify further discovery.

In United States v. Cordoba Ruiz, the defendant moved to compel evidence of cooperation between the United States and Colombian law enforcement. No. 22-cr-121 (LJL), 2023 WL 6811646 (S.D.N.Y. Oct. 16, 2023). The district court denied the motion because

"Defendants have proffered no evidence that the Colombian authorities acted in any way as agents or virtual agents of United States law enforcement." Id. at *5. The court noted that "the Government asserts, and Defendant does not refute, that all of the cooperation it had with the Colombian authorities was with respect to [a Mutual Legal Assistance Treaty ("MLAT")] request." Id.; see also Getto, 729 F.3d at 231 ("the American government has proffered, and Getto has not rebutted" that U.S. law enforcement did not participate in Israeli law enforcement actions).

Hiya—who has received Rule 16 discovery, including communications between the prosecution team and the Malaysian-based FBI agents—has not refuted the Government's proffer. As discussed more fully below, his arguments of U.S. Government control or direction are based on innocuous requests for information from Malaysian officials that do not justify an expansion of the Government's discovery obligations.

Separately, Hiya moves for an evidentiary hearing under Rule 41(g). Rule 41(g) provides that the Court "must receive evidence on any factual issue necessary to decide the motion." When deciding a motion for the return of property seized by the government, an evidentiary hearing is appropriate "only if any disputed material facts are necessary to the decision of the motion." United States v. Podlog, 108 F.3d 1370, 1370 (2d Cir. 1997) (internal quotation marks omitted); see also United States v. Figueroa, No. 22 Mag. 4490 (ER), 2022 WL 2873226, at *4 (S.D.N.Y. July 21, 2022) (refusing to hold an evidentiary hearing because there were "no remaining disputed material facts"). An evidentiary hearing "is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." In re Terrorist Bombings of U.S. Embassies in East Africa, 552 F.3d 157, 165 (2d Cir. 2008); see also Getto,

729 F.3d at 226, n.6 (even assuming Getto's allegations to be true, "the District Court did not abuse its discretion in declining to hold an evidentiary hearing").

Hiya has not presented "definite, specific, detailed, and nonconjectural" evidence to rebut the Government's proffer. Therefore, there are no disputed material facts, and an evidentiary hearing is not warranted.

### B. Allegations of U.S. Government Control or Direction Over Malaysian Authorities

Thus, the Court considers Hiya's arguments on the existing record. In order to "render foreign law enforcement officials virtual agents of the United States, American officials must play some role in controlling or directing the conduct of the foreign parallel investigation." Getto, 729 F.3d at 230 (citing Lee, 723 F.3d at 140). Hiya makes three arguments to support the finding that the RMP acted as virtual agents of the United States: (1) U.S. law enforcement officials were in contact with Malaysian law enforcement before Hiya was arrested; (2) Malaysia was not conducting a parallel investigation until the United States brought Hiya to their attention; and (3) Malaysia "re-arrested" Hiya at the behest of U.S. officials.

First, the mere fact that U.S. officials were in contact with the Malaysian government regarding Hiya before his arrest is insufficient. The contact was routine and does not contain hallmarks of control or direction. The United States sent an information request about Hiya to Malaysia a few months before his arrest. ECF No. 42-1. In that request, they detailed some of Hiya's criminal history. But the Government did not direct Malaysia to investigate or arrest Hiya. Therefore, the request does not show control over the Malaysian officials, even if the United States's ultimate hope was that the request would trigger a parallel Malaysian investigation. See, e.g., United States v. Maturo, 982 F.2d 57, 61 (2d Cir. 1992) ("At most the evidence shows that the DEA requested background information on the Turkish telephone

numbers, with the hope that the TNP would wiretap the numbers."). Sharing information is not direction or control. Getto, 729 F.3d at 231 ("[I]nformation-sharing and cooperation across parallel investigations . . . [does not show] control[] or direct[ion] by American law enforcement."). There is no evidence that U.S. law enforcement directed the Malaysian government to arrest Hiya. The correspondence between the two convincingly shows that the United States did not even know Malaysia had arrested Hiya until, at the earliest, two days after his arrest. See ECF Nos. 42-2, at 6, 9-10; 45-4, at 5-6. U.S. officials learned of his arrest through the public media, not correspondence with Malaysia. See ECF No. 42-2, at 7-9. This evidence suggests that the American government had no control over Malaysian authorities; the Malaysian government made its own decisions regarding the arrest and did not even inform the United States of its actions.

The fact that the Malaysian government responded to the information request with routine information about Hiya is similarly unpersuasive. "We have long allowed foreign authorities to share the fruits of an investigation with their American counterparts without suggesting or assuming that the latter controlled the investigation." Getto, 729 F.3d at 231; see also id. at 224 ("[O]ngoing collaboration between an American law enforcement agency and its foreign counterpart in the course of parallel investigations does not—without American control, direction, or an intent to evade the Constitution—give rise to a relationship sufficient to apply the exclusionary rule . . . ."); Lee, 723 F.3d at 138 (affirming the district court, which found that "the mere fact that an MOU existed, information was shared and the DEA provided money, training and equipment does not warrant a finding of agency").

Hiya's second argument, that the Malaysian government did not undertake its own investigation until prompted by the United States, is similarly unavailing. Getto does not require that the foreign government was independently investigating a defendant or had no knowledge of

his existence without American involvement. In fact, in <u>Getto</u>, the Court of Appeals recognized that even if Israeli police would not have investigated the defendant but for the United States's request, that would not "bear upon whether American law enforcement directed the subsequent investigation in Israel." <u>Getto</u>, 729 F.3d. at 232. It would show only that the Israeli police "was unaware of a criminal conspiracy within its jurisdiction," and that the victims of that conspiracy were residing in the United States. <u>Id.</u>; <u>see also</u> <u>Maturo</u>, 982 F.2d at 61 ("[T]he fact that the TNP did not initiate the wiretap until the DEA gave them the numbers demonstrates only that the TNP was unaware that these individuals were using their phones to traffic narcotics."). Even if U.S. officials went as far as requesting that the Malaysian government investigate or arrest Hiya, that would not be sufficient to show control or direction. <u>See</u> <u>Getto</u>, 729 F.3d at 230 ("It is not enough that the foreign government undertook its investigation pursuant to an American [] request."). "A mere request [by United States officials] is not sufficient to show control." <u>United States v. Gasperini</u>, 894 F.3d 482, 489 (2d Cir. 2018); <u>see also</u> <u>Getto</u>, 729 F.3d at 231 ("Although American law enforcement agents requested assistance with investigating Getto and shared the results of their preliminary investigation . . . with the INP, the foreign law enforcement agency conducted an independent, parallel investigation.").

Finally, Hiya argues that his alleged "re-arrest" was at the behest of U.S. law enforcement. Hiya references internal communications between FBI agents asking if Malaysian officials would hold Hiya "a bit longer." ECF No. 42-2, at 3, 5. Nothing about these communications shows the high threshold of control and direction required by <u>Getto</u>. Hiya can point only to suggestions and inferences as support for this argument. There is no evidence that a re-arrest occurred in the first place, much less evidence demonstrating that the Government affirmatively directed the Malaysians to re-arrest Hiya.

Because the evidence demonstrates that U.S. law enforcement did not control or direct Malaysian law enforcement, actions taken by the RMP in arresting Hiya cannot be imputed to the Government. No constitutional restrictions apply to the RMP's actions, and I recommend that the Court deny Hiya's motion for the return of his property.

## III.  Motion to Seal

When Hiya filed a supplemental letter of support to his Rule 41(g) motion, he filed certain exhibits under seal to comply with a protective order in place in this case. ECF No. 45. Because the sealing was to protect the interests of the United States and its allies, the Government has moved to seal only Exhibit G of the eight exhibits Hiya initially filed under seal. It does not oppose unsealing the remaining documents. ECF No. 49, at 1 n.1. Hiya takes no position on the request to maintain sealing of Exhibit G.[2] ECF No. 50.

The motion to seal Exhibit G is GRANTED. The other exhibits attached to Hiya's supplemental letter at ECF No. 45 should be UNSEALED.

### A.  Common Law Right of Access

#### 1.  Applicable Law

The Government argues that the common law right of public access is outweighed by the limited relevance of Exhibit G and the significant law enforcement risks of disclosure. Generally, the public has a common law right of access to judicial documents. Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597-98 (1978). "The notion that the public should have access to the proceedings and documents of courts is integral to our system of government." United States v. Erie Cnty., 763 F.3d 235, 238–39 (2d Cir. 2014). "Indeed, the common law right of public access to judicial documents is said to predate even the Constitution itself." Id. at 239. A party seeking

---

[2] Hiya opposes sealing only to the extent that the Government's request depends on the argument that the exhibit has "limited relevance to any judicial determination by the Court." ECF No. 50.

to seal documents submitted to a court bears the burden of showing that sealing is proper. See DiRussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 826 (2d Cir. 1997). Ultimately the decision to seal "is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." Nixon, 435 U.S. at 599.

The Court must first determine whether the documents sought to be sealed are judicial documents. "[T]o be designated a judicial document, the item filed must be relevant to the performance of the judicial function and useful in the judicial process." Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks omitted). Judicial documents are presumptively public so that the federal courts "have a measure of accountability" and so that the public may "have confidence in the administration of justice." United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1048 (2d Cir. 1995). But "the fact that a document is a judicial record does not mean that access to it cannot be restricted." United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 146 (2d Cir. 1995).

Second, once the Court deems a document a judicial document, "the common law right attaches with different weight depending on two factors: (a) the role of the material at issue in the exercise of Article III judicial power and (b) the resultant value of such information to those monitoring the federal courts." Newsday LLC v. Cnty. of Nassau, 730 F.3d 156, 165 (2d Cir. 2013) (internal quotations marks omitted) (citing Amodeo II, 71 F.3d at 1049). When a document plays a role in a court's adjudication of litigants' substantive rights, the presumption is strong, but "[a]s one moves along the continuum, the weight of the presumption declines." Amodeo II, 71 F.3d at 1049.

Third, the Court must balance any "competing considerations" against the weight of the presumption of access. Lugosch, 435 F.3d at 120. "Such countervailing factors include but are not limited to 'the danger of impairing law enforcement or judicial efficiency' and 'the privacy

17

interests of those resisting disclosure.'" Id. (quoting Amodeo II, 71 F.3d at 1050). When weighing privacy interests, courts should consider "the degree to which the subject matter is traditionally considered private rather than public." Amodeo II, 71 F.3d at 1051.

### 2. Application of the Common Law Right of Access

The common law right of access to Exhibit G is overcome by strong countervailing interests. First, the exhibit sought to be sealed is a judicial document. The exhibit details communications among U.S. law enforcement regarding Hiya's arrest in Malaysia. The Court reviewed these communications in determining the role the United States played in the Malaysian government's arrest of Hiya. This review bore on the ultimate issue of whether the Malaysian authorities were virtual agents of the United States. Therefore, Exhibit G is a "judicial document" subject to the presumption of public access.

The Court disagrees with the Government that the exhibit has limited relevance. It was considered when deciding whether additional discovery should be compelled and whether Hiya had rebutted the Government's proffer that it did not direct or control the Malaysian authorities. But the Court has adequately described those communications to allow the public to monitor the judicial process. And there are strong competing law enforcement considerations that weigh against the presumption of access. The document contains internal communications by law enforcement officials, including foreign counterparts, regarding sensitive issues implicating national security. As the Government explains, disclosing this type of sensitive information may jeopardize other countries' future willingness to communicate with the United States on matters of law enforcement interest. See Amodeo II, 71 F.3d at 1050 ("If release is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access.").

Accordingly, the common law right of public access does not require that Exhibit G be unsealed.

**B. First Amendment Right of Access**

**1. Applicable Law**

Because the First Amendment right of public access is stronger than the common law right, the Court must also analyze the Government's motion under that law. See Erie Cnty., 763 F.3d at 241 (First Amendment right of public access "is stronger and can only be overcome under more stringent circumstances than the common law presumption").

In analyzing whether the First Amendment right to access applies to judicial records, courts apply a two-part approach, which considers "both whether the documents have historically been open to the press and general public and whether public access plays a significant positive role in the functioning of the particular process in question." Lugosch, 435 F.3d at 120 (internal quotation marks omitted). The presumptive right of access prevails unless it is overcome by "specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." Id. at 124. "Broad and general findings by the trial court . . . are not sufficient to justify closure." Id. (quoting In re N.Y. Times Co., 828 F.2d 110, 116 (2d Cir. 1987)). Examples of higher values may include law enforcement interests, the privacy of innocent third parties, and the attorney-client privilege. See Amodeo II, 71 F.3d at 1050; Lugosch, 435 F.3d at 125; Brown v. Maxwell, 929 F.3d 41, 47 n.13 (2d Cir. 2019) (the law enforcement privilege is a "higher value" considered in the First Amendment sealing analysis). Courts in this District have held that disclosing documents that detail the Government's efforts to obtain evidence and investigate crimes should remain under seal when analyzed under the First Amendment framework. See, e.g., United States v. Madoff,

626 F. Supp. 2d 420, 427-28 (S.D.N.Y. 2009); <u>United States v. All Funds on Deposit at Wells Fargo Bank in San Francisco, California</u>, 643 F. Supp. 577, 585 n.8 (S.D.N.Y. 2009).

### 2.  Application of the First Amendment Right of Access

While the Court concludes that the communications in Exhibit G are judicial documents, these confidential communications between foreign-based FBI agents and law enforcement in the host country have not historically been open to the press and general public. Additionally, because the Court has described the communications, the public can adequately evaluate the Court's determination. Thus, "experience and logic" do not strongly favor making Exhibit G available to the public. <u>Erie Cnty.</u>, 763 F.3d at 239 (citing <u>Lugosch</u>, 435 F.3d at 120).

More importantly, however, the First Amendment right is overcome by the countervailing interest in protecting important law enforcement objectives. Here, the Government fears that "[d]isclsoing such sensitive information concerning communications with another sovereign would jeopardize other countries' willingness to communicate with the Government." ECF No. 49, at 3. The Government specifically addresses the need for "candid" discussion with foreign counterparts regarding possible transfers of individuals for purposes of prosecution in the United States, which might be chilled if there is a risk of public disclosure. <u>Id.</u> The Court adopts these findings as adequate higher values to justify sealing. Accordingly, the First Amendment right of access is overcome by the law enforcement interest.

Therefore, the motion to seal Exhibit G is GRANTED. All other sealed exhibits at ECF No. 45 shall be made available on the public docket.

## CONCLUSION

Hiya's motions for an evidentiary hearing and to compel production of additional documents are DENIED. The motion to seal Exhibit G is GRANTED.

I further recommend that the Court find that Malaysian authorities did not act as virtual agents of U.S. officials in connection with Hiya's arrest, and the seizure of Hiya's property was lawful. Accordingly, the Court should DENY the motion for the return of property.

 

SARAH NETBURN
United States Magistrate Judge

DATED:     April 21, 2025
           New York, New York

 

\*                 \*                 \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable Victor Marrero if required by that judge's Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Marrero. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).